## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PureChoice, Inc.,                               Civil No. 07-1290 (DWF/SRN)

             Plaintiff,

v.                                              **MEMORANDUM**
                                                **OPINION AND ORDER**
Jeffrey Macke,

             Defendant.

---

Jack Y. Perry, Esq., and Valerie T. Herring, Esq., Briggs & Morgan, PA, counsel for Plaintiff.

Aaron R. Hartman, Esq., and Norman J. Baer, Esq., Anthony Ostlund & Baer, PA, counsel for Defendant.

---

## INTRODUCTION

On February 1, 2007, Plaintiff PureChoice, Inc. ("PureChoice") filed suit in Hennepin County District Court against Defendant Jeffrey Macke, a California resident, alleging three causes of action: (1) tortious interference with contractual relationships (Count 1); (2) intentional interference with prospective advantage (Count 2); and (3) fraud (Count 3). Jeffrey Macke thereafter removed the above-entitled case to this Court on grounds of diversity jurisdiction. The matter is currently before the Court pursuant to Jeffrey Macke's Motion to Dismiss Plaintiff's Complaint, to Strike Allegations from the Pleadings, and for Sanctions. Jeffrey Macke's Motion to Dismiss pertains to Count One and Count Three of the Complaint; both parties agree that Count

Two has been sufficiently pled.  For the reasons set forth below, Jeffrey Macke's motion is granted in part and denied in part.

## BACKGROUND

PureChoice is an off-site quality monitoring company that was formed in 1992. Former Dayton Hudson Corporation's CEO Kenneth Macke, Jeffrey Macke's father, was one of PureChoice's major shareholders, who served on PureChoice's board of directors from 1996 to 2003.  In September 2002, PureChoice's Board of Directors approved a new financing plan using convertible debt in order to raise money for the company (the "Offering").  The initial amount of the Offering was to be $12 million and each loan was to be evidenced by a purchase agreement and promissory note (the "Notes") secured by the company's assets and personally guaranteed by the three members of PureChoice's board of directors—Kenneth Macke, Bryan Reichel, and Richard Perkins.  PureChoice alleges that the capital received from the Offering would have allowed it to pay off its high interest loans and allowed it to obtain much-needed working capital.

On September 12, 2002, in furtherance of the new financing plan, the three PureChoice directors signed unconditional personal guaranties for up to the full amount of the Offering.  Kenneth Macke's guaranty (the "Guaranty") read in part as follows:

> The Guarantors absolutely and unconditionally guarantee to the Investors, jointly and severally, the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, the unpaid obligations of PureChoice under each of the Notes that have not been previously converted or redeemed (hereinafter, the "Indebtedness").

(Affidavit of Aaron R. Hartman ("Hartman Aff."), Ex. D at 1.)  The Guaranty also

provides that it is "to induce PureChoice to execute the Notes and to induce individuals and/or entities to purchase the Notes."  (Hartman Aff., Ex. D at 1.)  The Notes were subject to a right of conversion, meaning that Note holders were allowed, but not required, to convert their Notes to PureChoice common stock.  PureChoice hoped that the anticipated future success of the company would serve as an incentive for investors to convert their Notes into common stock and thus eliminate the exposure for each of the directors on the Guaranties.  At the time Kenneth Macke signed his Guaranty, he was a well-known and well-respected businessman throughout the Twin Cities.

PureChoice alleges that by 2002, Jeffrey Macke had determined that PureChoice was a bad investment for his father and was upset about his father's $12 million Guaranty.  Starting in May/June 2003, PureChoice alleges that Jeffrey Macke sought to discourage investors' investments in the Offering because if no one invested in the Offering, then his father's Guaranty would be effectively moot.  Specifically, PureChoice alleges that Jeffrey Macke:  (1) hired an attorney to purportedly act on behalf of his father (when such action was unauthorized by his father)[1]; (2) authorized the attorney to inform

---

[1]     PureChoice bases its allegation that Jeffrey Macke had no authority to act on behalf of his father on representations that his father had made in a litigation settlement (the "M&I settlement") agreement entered into in the fall of 2006. The M&I settlement was a result of a separate lawsuit brought by Marshall and Ilsey Bank ("M&I") against PureChoice, Kenneth Macke, Reichel, and Perkins in connection with unpaid loans to PureChoice. There, Kenneth Macke represented to PureChoice that he was in no way involved in any efforts to interfere with or impede the Offering at issue here. Specifically, the settlement agreement stated the following:

(Footnote Continued on Next Page)

PureChoice that his father was suspending his Guaranty; (3) authorized the attorney to inform PureChoice that his father did not have the financial means to support the Guaranty; (4) authorized the attorney to inform PureChoice that his father did not have the capacity to enter into the Guaranty; and (5) told members of the investment community that his father's estate was insufficient to honor his Guaranty.[2]  PureChoice alleges that Jeffery Macke made these statements knowing them to be false and with the intention of discouraging potential investors from investing in the Offering.

PureChoice asserts that its allegations are supported by an e-mail and letters that either Jeffrey Macke or his attorney sent to PureChoice.  Specifically, on May 24, 2003,

---

(Footnote Continued From Previous Page)

> Neither Kenneth nor Kathleen Macke were involved individually or in concert with anyone else to interfere with or impede PureChoice's offering of securities pursuant to the confidential private placement memorandum dated December 5, 2002 and any supplements or amendments thereto ("Convertible Debenture Offering"), including, without limitation:
>
> > i.  Any false statements related to Kenneth Macke's financial ability to honor the September 12, 2002 unconditional guaranty relating to the Convertible Debenture Offering ("Guaranty"); and
> >
> > ii.  Any false statements related to the enforceability of the Guaranty signed by Kenneth Macke or related to Kenneth Macke's mental competency to execute the Guaranty.

(Hartman Aff., Ex. F at ¶ 6(a).)

[2]     PureChoice asserts that its allegation that Jeffrey Macke made false statements to local businessmen is for background purposes and to support its intentional interference with prospective advantage claim, which is not at issue here.  PureChoice asserts that its fraud claim is based only on the false statements that Jeffrey Macke made to PureChoice.

Jeffrey Macke sent an e-mail to Reichel and Perkins stating that "[m]y father has instructed me to tell you that there will be no more money from him for PureChoice." (Compl. ¶ 29.)  Then, on June 9, 2003, Paul Ravich, who PureChoice alleges is the lawyer that Jeffery Macke hired to purportedly act on behalf of his father, sent a letter to PureChoice.  The letter states, "I represent Mr. Kenneth A. Macke and this letter is written on his behalf."  (Hartman Aff., Ex. E.)  The letter also states in part as follows:

> Mr. Macke hereby suspends his guarantee of the Series A Convertible Promissory Notes pending our receipt and evaluation of the [requested] information/documents.  Accordingly, Mr. Macke's guarantee of the Notes will not be effective unless and until you are notified in writing, of the renewed effectiveness.

(Compl. ¶ 36; Hartman Aff., Ex. E.)  Upon receipt of the June 9 letter, PureChoice's counsel called Ravich and requested that Kenneth Macke rescind the suspension of his Guaranty because PureChoice had several interested investors.

On July 14, 2003, Ravich sent a letter to PureChoice's counsel relaying that Kenneth Macke was refusing to rescind the suspension of the Guaranty.  The letter also stated:

> You stated that the Company had several note purchasers lined up for a closing within a few days.  I advised you that if you came to us with legitimate note purchasers who were ready to close, Mr. Macke would carefully consider rescinding the suspension of this guaranty.  To date, I have heard nothing from you regarding the imminent closing of any note sale.
>
>     . . . .
>
> I understand that Mr. Morrison disclosed to Mr. Reichel and Mr. Perkins that Mr. Macke is currently suffering some financial distress and that US

5

Bank and Wells Fargo Bank (which have made substantial loans to Mr. Macke unrelated to the Company) have expressed significant concern as to his financial health.  In short, Mr. Macke's financial condition and lack of liquidity raise serious questions as to his ability to honor any guaranty of the notes . . .

Under the circumstances, and given that the Company has been advised by at least one lender that it would make loans to the Company only against the guarantees of Mr. Macke and Mr. Perkins, full disclosure as to the financial condition of Mr. Macke, Mr. Perkins, Mr. Perkins' trust and Mr. Reichel must be made to any person considering a purchase of the notes.  In my opinion, failure to provide such disclosure would, among other things, constitute a material violation of federal and state securities laws.  In any event, Mr. Macke will not consider rescinding the suspension of his guaranty unless such disclosure is made . . .

Please understand that our discussion of guaranty related issues is not meant to be taken as an admission by Mr. Macke that his guaranty of the notes is valid and enforceable against him.  We believe that there are significant legal issues which impact the enforceability of that guaranty and we expressly reserve the right of Mr. Macke to assert any and all defenses available to him in any action relating to it . . . [including] . . . the manner in which the guaranty was executed and the manner in which it was intended to operate.  We also have concerns relating to Mr. Macke's health.  As I believe you know, Mr. Macke has suffered from serious health problems for a substantial period of time and those problems, among other things, affect his cognitive ability.  I can tell you that Mr. Macke has no recollection of signing the guaranty.

(Hartman Aff., Ex. G; *see also* Compl. ¶ 38.)

On August 1, 2003, Ravich sent another letter to PureChoice, which stated in

relevant part the following:

As we have discussed, Mr. Macke's financial position is extremely illiquid and he presently would be unable to honor guarantees if required to do so.

Second, I believe that the federal and state securities laws require a disclosure to prospective investors that Mr. Macke contests the validity and enforceability of any agreement he has signed to guaranty the convertible

6

> notes.  Certainly, if an investor is relying upon Mr. Macke's guaranty, the
> investor should be advised that Mr. Macke will not willingly pay on the
> alleged guaranty until the validity and enforceability of the guaranty have
> been fully litigated.
>
> Notwithstanding the foregoing, as I have previously informed you, if
> you have a bona fide purchaser of the convertible notes, Mr. Macke is
> willing to consider a guaranty on a case by case basis.

(Hartman Aff., Ex. H; *see also* Compl. ¶ 40.)

PureChoice alleges that the representations made regarding Kenneth Macke's

financial position in these communications were false because Kenneth Macke had ample

financial resources at the time.  PureChoice cites to several guarantees, loans, and

personal revolving lines of credit that Kenneth Macke had made around that time period,

along with Kenneth Macke's net worth and stock ownership.  (Compl. ¶¶ 51-59.)  In

addition, PureChoice alleges that the representations made regarding Kenneth Macke's

cognitive ability were also false because at that time, Kenneth Macke paid his expenses,

signed documents transferring securities, executing deeds, purchasing shares of stock, and

served on boards and committees and acted in an advisory role.  (Compl. ¶¶ 61-70.)

PureChoice also alleges that people have testified that Kenneth Macke was competent

during that time period (Compl. ¶¶ 72-73), and that Kenneth Macke's medical records

confirm that he was competent as well.  (Compl. ¶¶ 77-91.)

Even so, because the representations were made, PureChoice alleges that it was

required to provide supplemental disclosures to the private placement memorandum for

the Offering.  On August 5, 2003, PureChoice provided a supplemental disclosure.  In

that supplemental disclosure, PureChoice warned potential investors that, according to

Kenneth Macke's counsel, "a question has been raised as to the continuing validity of

[Kenneth Macke's] financial guarantees.  Both [PureChoice] and its counsel believe that

[Kenneth Macke's] irrevocable guarantee remains valid, however, there can be no

assurance that someone will not contest the validity of the guarantee or that their

challenge, if made, will not be successful."  (Compl. ¶ 48.)  On January 22, 2004,

PureChoice issued another supplemental disclosure stating that according to Kenneth

Macke's counsel:

> [PureChoice] has no authority to represent that Mr. Macke has guaranteed
> the Notes offered hereby, has no authority to provide financial information
> regarding Mr. Macke to potential investors and that Mr. Macke's financial
> information (previously provided at Mr. Macke's request to the Company
> by Mr. Macke's accountant) was inaccurate.  Mr. Macke's counsel also
> indicated that Mr. Macke intends to contest the validity of his signature.

(Compl. ¶ 49.)

PureChoice alleges that Jeffery Macke achieved his goal in that several interested

investors backed out, and, as a result, PureChoice lost its expected financing and

opportunity to grow its business.  Specifically, PureChoice raised a total of $920,000

from the Offering, which is $11.08 million less than it claims it would have raised had

Jeffery Macke not interfered.  As to the "interested investors" PureChoice specifically

alleges the following in its Complaint:

> Based on the challenges to the Kenneth Macke Guaranty, several investors
> who had orally committed to large investments in PureChoice through the
> [Offering] decided to back out.  In particular:

(a)  Stan Baratz, President of Baratz Financial, along with his partners, had indicated to PureChoice that his group intended to invest six million dollars or more in the Convertible Debenture Offering . . . .

(b)  Mike Harris marketed the Convertible Debenture Offering to investors who, collectively, were interested in investing five million dollars or more in the offering . . . .

(c)  Arnold Abens had located investors willing to purchase at least three million dollars in the Convertible Debenture Offering, and he believed he could find investors willing to purchase several million more . . .

(d)  Douglass McConnell, at William Blair, Inc., similarly had begun marketing the Convertible Debenture Offering shortly before receiving word of Jeffrey Macke's challenges to the Kenneth Macke Guaranty.  In that short time period, he had located some interested investors.

(Compl. ¶ 50.)  PureChoice alleges that "due to the challenges to the Kenneth Macke Guaranty orchestrated by Jeffrey Macke," these people were unable to successfully market the investment and any investors who were initially interested were now unwilling to invest.  (*Id.*)

# DISCUSSION

## I.      Standard of Review

A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).[3]  In deciding a motion to dismiss, a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged.  *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

---

[3]      The Court has considered the materials and documents embraced by the Complaint in considering Jeffrey Macke's Motion to Dismiss.  Such review does not convert the motion into a Rule 56 motion for summary judgment.  PureChoice does not object to the Court's treatment of the motion as a Rule 12(b)(6) motion to dismiss.

**II.      Count One - Tortious Interference with Contract**

Jeffrey Macke moves to dismiss Count One pursuant to Fed. R. Civ. P. 12(b)(6)

for failure to state a claim.  In order to prevail on a tortious interference with contract

claim, the plaintiff must demonstrate:  (1) the existence of a contract; (2) the alleged

wrongdoer's knowledge of the contract; and (3) an intentional procurement of its breach;

(4) without justification; (5) that results in damage to the plaintiff.  *Maness v. Star-Kist*

*Foods, Inc.*, 7 F.3d 704, 709 (8th Cir. 1993) (citing *Furley Sales and Assoc., Inc. v. N.*

*Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)).  The first and third

elements are at issue here.

Specifically, Jeffrey Macke contends that PureChoice has not sufficiently pled

formation of a contract to which it was a party and has not sufficiently pled a breach.  In

response, Jeffrey Macke asserts that the "contract" that was formed was the "Guaranty."

However, the Guaranty was a contract between Kenneth Macke and the investors; it did

not bind PureChoice to Macke.  As such, Jeffrey Macke contends that PureChoice was

not a party to that contract and therefore lacks standing to assert a tortious interference

with a contract claim.

Alternatively, even if found that PureChoice was a party to the Guaranty, Jeffrey

Macke asserts that his father did not breach that contract because with no investors, there

were no loans and thus nothing for him to guaranty.  According to Jeffrey Macke,

because there was nothing to guaranty, his father could not have breached his Guaranty.

Further, Jeffrey Macke asserts that even if a claim did exist under the theory that the

Guaranty was breached, any claim was released by PureChoice in the M&I Litigation.[4]

PureChoice, on the other hand, contends that Kenneth Macke and PureChoice entered into a two-party contract first in early September 2002.  In this contract, PureChoice asserts that it authorized the offering of up to $12 million in interest-bearing notes and Kenneth Macke and the other two board directors promised that they would guaranty it.  Therefore, PureChoice asserts that the contract between PureChoice and Kenneth Macke was a contract to enter into a future contract, with one aspect being a guaranty.  PureChoice asserts that there is evidence of this first contract contained in the Kenneth Macke Guaranty, which states:

> WHEREAS, in order to induce PureChoice to execute the Notes and to induce individuals and/or entities to purchase the Notes, the Guarantors have agreed to execute and deliver this Guaranty.

(Hartman Aff., Ex. D at 1.)  In addition, PureChoice points to the principal offering document, whereby the placement memorandum states:

---

[4]     PureChoice contends that it did not release its claims against Jeffrey Macke in the M&I Litigation.  The Court agrees with PureChoice.  The M&I settlement agreement expressly allowed for such a suit:

> Notwithstanding the mutual release in paragraph 10 below, *this Agreement has no impact whatsoever on any claims PureChoice, Perkins or Reichel may have against Jeffrey Macke,* or any other person or entity other than those identified in paragraph 10 below, including, without limitation, any claim against anyone that was involved individually or in concert with anyone else to in any way interfere with or impede PureChoice's offering of securities pursuant to the Convertible Debenture Offering.

(Hartman Aff., Ex. F at ¶ 6.b (emphasis added).)

>The Convertible Notes will also be secured by the joint and several personal guarantee of the Company's President (Bryan S. Reichel) and two directors (Richard W. Perkins and Kenneth A. Macke) and the Richard W. Perkins Revocable Trust . . . The guarantors will receive five-year warrants exercisable at $1.50 per share in connection with the execution of the guaranty.  The number of warrants to be issued will be determined by multiplying the aggregate amount of Convertible Notes guaranteed by ten percent (10%).

(Hartman Aff., Ex. A at FCB 00447.)  Therefore, PureChoice asserts that the guarantors pledged to guaranty the Notes, and PureChoice committed to offer the Notes to investors and to give the guarantors five-year warrants.  PureChoice asserts that this is the contract that Jeffrey Macke interfered with by purporting to suspend Kenneth Macke's contractual obligation.

PureChoice also contends that the Complaint properly alleges that Kenneth Macke breached the contract.  Specifically, PureChoice alleges that Jeffrey Macke and the attorney who purportedly represented Kenneth Macke repudiated Kenneth Macke's obligations to PureChoice through the written communications to PureChoice stating that Kenneth Macke "hereby suspends his guarantee," that Kenneth Macke refuses to rescind the suspension of his Guaranty, and that Kenneth Macke's "financial position is extremely illiquid and he presently would be unable to honor guaranties if required to do so."  (Compl. ¶¶ 36-40.)  According to PureChoice, these anticipatory repudiations constitute a breach of the contract between Kenneth Macke and PureChoice.  Jeffrey Macke responds by asserting that the letters cannot constitute repudiation because they were expressly conditioned.

The Court agrees with Jeffrey Macke.  An anticipatory repudiation of contract is a breach of a contract.  *See Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443, 450 (Minn. 1980).  "[A]n unconditional repudiation of a contract, either by words or acts, which is communicated to the other party prior to the time fixed by the contract for its performance constitutes an anticipatory breach."  *In re Haugen*, 278 N.W.2d 75, 79 n.6 (Minn. 1979).  In the July 14, 2003 letter from Ravich to PureChoice, Ravich stated the following:

> You stated that the company had several note purchasers lined up for a closing within a few days.  I advised you that if you came to us with legitimate note purchasers who were ready to close, Mr. Macke would carefully consider rescinding the suspension of his guaranty.

(Hartman Aff., Ex. G.)  Then, in the August 1, 2003 letter from Ravich to PureChoice, Ravich stated that "if you have a bona fide purchaser of the convertible notes, Mr. Macke is willing to consider a guaranty on a case by case basis."  (Hartman Aff., Ex. H.)  These words therefore made any repudiation of Kenneth Macke's Guaranty conditional.[5]  Therefore, PureChoice has not sufficiently pled a breach and its claim for tortious interference with contract must be dismissed.

Furthermore, the Court notes that PureChoice has also not sufficiently pled the formation of a contract to which it was a party.  Although it is true that the evidence PureChoice points to in its brief does support the creation of a contract in early September

---

[5]     Here, if Ravich was Kenneth Macke's attorney, which is what the document states, then the purported repudiation was not unconditional.  If Ravich was in fact Jeffery Macke's attorney, which is what was pled, then there was no repudiation on behalf of Kenneth Macke.  Either way, PureChoice has not sufficiently pled breach of contract.

(Footnote Continued on Next Page)

2002 between PureChoice and Kenneth Macke, which was before Kenneth Macke signed his Guaranty, this assertion is at odds with what the Complaint actually states.  Paragraph 98 of the Complaint reads, "The Kenneth Macke Guaranty was a contract between PureChoice and Kenneth Macke."  But the Guaranty was a contract arguably between PureChoice, Kenneth Macke, and the investors.  The Complaint makes no mention of the two-party contract that PureChoice now alleges was the basis for Jeffrey Macke's interference.  Therefore, assuming all facts in the Complaint to be true and construing all reasonable inferences from those facts in the light most favorable to PureChoice, the Court finds that the Complaint does not contain sufficient allegations to show formation of a contract on which to base its tortious-interference-with-contract claim.

## III.    Count Three - Fraud

Jeffery Macke moves to dismiss count three pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim and pursuant to Fed. R. Civ. P. 9(b)[6] for failure to plead fraud with sufficient particularity.  In order to prove fraud, PureChoice must establish that Jeffrey Macke:  (1) made a representation; (2) that was false; (3) having to do with a past or present fact; (4) that is material; (5) and susceptible of knowledge; (6) that the representer knows to be false or is asserted without knowing whether the fact is true or false; (7) with the intent to induce the other person to act; (8) and the person in fact is

---

(Footnote Continued From Previous Page)

[6]      Federal Rule of Civil Procedure 9(b) states that "[i]n all averments of fraud . . . the
(Footnote Continued on Next Page)

induced to act; (9) in reliance on the representation; (10) that the plaintiff suffered

damages; (11) attributable to the misrepresentation.  *See M.H. v. Caritas Family Servs.*,

488 N.W.2d 282, 289 (Minn. 1992).

Specifically, Jeffrey Macke asserts that PureChoice has failed to allege, and cannot

allege, that Jeffrey Macke's actions proximately caused any economic harm suffered by

PureChoice.  In other words, even if PureChoice is able to show that it relied on Jeffrey

Macke's false representations,[7] Jeffrey Macke contends that PureChoice has not pled that

the false representations caused economic harm because at the moment that PureChoice

issued the supplemental disclosure, it did not suffer any economic loss.  Jeffrey Macke

also asserts that PureChoice's claim fails as a matter of law because PureChoice's

allegations that it now has an unfavorable debt structure and a need for more working

capital, are problems that PureChoice had before Jeffrey Macke commenced any of the

alleged actions.  Jeffrey Macke points out that the offering documents explain that

PureChoice could provide "no assurance . . . that any proceeds received [from the

Offering] will be sufficient to meet its current obligations or pursue its business plans."

(Hartman Aff., Ex. A at FCB 000451.)  Jeffrey Macke also contends that whether

PureChoice would have succeeded as a result of receiving the investors' money is

_____

(Footnote Continued From Previous Page)
circumstances constituting fraud . . . shall be stated with particularity."
[7]     Jeffrey Macke concedes that PureChoice's decision to issue supplemental
disclosures arguably satisfies the reliance element of its fraud claim for pleading
purposes.

speculative.  Specifically, Jeffrey Macke asserts that several risk factors might have affected PureChoice's success, including risk due to a lack of "market acceptance of the Company's products and services," which at the time were "still emerging," reliance on only two product segments, competition, and dependence on a single industry for its sales. (Hartman Aff., Ex. A at FCB 000450-53.)

Additionally, Jeffrey Macke asserts that PureChoice's fraud claim is not pled with particularity because PureChoice has not provided the details surrounding the purported lost investors.  Specifically, Jeffrey Macke asserts that PureChoice has not identified the purported lost investors and has not pleaded any connection between the "challenges" allegedly "orchestrated" by Jeffrey Macke and those lost investors.  Although the Complaint alleges that Mike Harris, Arnold Abens, and Douglass McConnell had located other investors who were willing to loan large sums of money to PureChoice pursuant to the Offering, Jeffrey Macke asserts that PureChoice has not stated whether Jeffrey Macke spoke with Harris, Abens, or McConnell (or Stan Baratz either), and if so, what was said to them and when, or whether any of these individuals actually received the supplemental disclosures.

PureChoice contends that it has sufficiently pled its fraud claim against Jeffrey Macke.  PureChoice alleges that Jeffrey Macke, through his attorney, made several false representations to PureChoice.  PureChoice contends that Jeffrey Macke misrepresented that:  (1) he and Ravich had the authority to represent Kenneth Macke; (2) he had the authority to "suspend" Kenneth Macke's obligation to guaranty the Notes; (3) Kenneth

Macke's Guaranty was worthless because he lacked financial resources; and (4) Kenneth

Macke's Guaranty was invalid because he was incompetent when he agreed to the

obligation.  PureChoice alleges that it suffered economic harm when the investors backed

out by not receiving the money that it would have received to pay off its high-interest

loans and for needed capital.  PureChoice also alleges that it lost the opportunity to grow

its business.  (Compl. ¶¶ 10, 14.)

Finally, PureChoice contends that Jeffrey Macke's actions caused these damages

to PureChoice.  PureChoice asserts that after receiving the letters from Ravich, it was

obligated under applicable securities laws to amend its offering documents and disclose to

potential investors that "a question [had] been raised as to the continuing validity of

[Kenneth Macke's] financial guaranties."  (Compl. ¶ 48.)[8]  PureChoice alleges that

investors who had made oral commitments backed out as a result of these amendments to

the offering documents.  Because nothing else was changed in the offering documents,

PureChoice contends that Jeffrey Macke's misrepresentations therefore were the

proximate cause of its damages.[9]

---

[8]     Ravich had warned PureChoice on two occasions that failure to disclose Kenneth
Macke's suspension of his Guaranty and the reasons for it would have constituted
securities-law violations.  (*See* Hartman Aff., Exs. G-H.)

[9]     PureChoice contends that its allegations that the Offering would have benefited
PureChoice are sufficient because it is certain that $12 million would have benefited
PureChoice by giving it the opportunity to pay on debt owed and to expand its business.
Thus, while the extent of the benefit may not be known, PureChoice contends that a
benefit was certain.  Further, PureChoice contends that even if the benefits to PureChoice

(Footnote Continued on Next Page)

18

PureChoice also contends that it has pled its fraud claim with the requisite particularity.  PureChoice asserts that it has pled the exact time, place, and content of Jeffrey Macke's misrepresentations, and the identity of the party who made them by disclosing the specifics regarding the letters sent by Jeffrey Macke through Ravich in paragraphs 32-42 of the Complaint.  PureChoice also alleges that it relied on the misrepresentations, and, as a result, was forced to make supplemental disclosures to its Offering memorandum and that, as a result of those supplemental disclosures, investors backed out.  (Compl. ¶¶ 48-49.)  According to PureChoice, the interested investors included Baratz Financial and the clients of Harris, Abens, and McConnell.  (Compl. ¶ 50(a)-(d).)

PureChoice contends that it does not need to identify the actual client-investors of Harris, Abens, and McConnell to meet its pleading requirements.  PureChoice contends that even if it wanted to identify those investors, it cannot, because it does not know those investors by name.  PureChoice contends that because the interests of Harris, Abens, and McConnell are not aligned with PureChoice, it would need additional discovery in order to obtain those names.  Finally, PureChoice contends that the investors' identities does not go to the circumstances constituting fraud.  Instead, PureChoice asserts that such information is only relevant to the damages that resulted from the fraud because its fraud claim is not based on the false representations made to investors, but is based on

---

(Footnote Continued From Previous Page)
are not precise, the issue is one of proof at trial in regard to PureChoice's damages.

misrepresentations that were made to PureChoice.  And because Rule 9(b) does not require that *damages* be pled with particularity, PureChoice therefore contends that it has satisfied its pleading requirements.

In an action sounding in fraud, "the aggrieved party must show not only detrimental reliance on the false representation or omission, but also that the false representation or omission caused the economic harm." *Zacharias v. Polinsky*, No. C3-03-304, 2003 WL 21694591, at *1 (Minn. Ct. App. 2003) (citing *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986)).  Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  The Eighth Circuit has explained that, for Rule 9(b), "'circumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby . . . .  [C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997) (quotations omitted).  Here, although whether PureChoice has sufficiently pled a fraud claim is a close call, the Court denies Jeffrey Macke's Motion to Dismiss at this time.

Assuming all facts in the complaint to be true and construing all reasonable inferences from those facts in the light most favorable to PureChoice, the Court finds that the Complaint does contain sufficient allegations to show fraud.  The Court finds that PureChoice demonstrates through its factual allegations an adequate causal nexus

between the underlying fraud alleged and PureChoice's economic loss. PureChoice

alleges that: (1) on May 24, 2003, Jeffrey Macke sent an e-mail to Reichel and Perkins

stating that "[m]y father has instructed me to tell you that there will be no more money

from him for PureChoice" (Compl. ¶ 29); (2) on June 9, 2003, Ravich, Kenneth Macke's

purported lawyer, sent a letter to PureChoice stating that "Mr. Macke hereby suspends his

guarantee" (Compl. ¶ 36); (3) on July 14, 2003, Ravich sent a letter to PureChoice stating

that Kenneth Macke was refusing to rescind the suspension of the Guaranty (Compl.

¶ 38); (4) on August 1, 2003, Ravich sent another letter to PureChoice, which stated that

"Mr. Macke's financial position is extremely illiquid and he presently would be unable to

honor guarantees if required to do so" (Compl. ¶ 40); (5) in two of those communications,

Ravich warned that failure to disclose Kenneth Macke's suspension of his Guaranty and

the reasons for it would have constituted securities-law violations; (6) on August 5, 2003,

PureChoice provided a supplemental disclosure, warning potential investors that

according the Kenneth Macke's counsel, "a question has been raised as to the continuing

validity of [Kenneth Macke's] financial guarantees . . . there can be no assurance that

someone will not contest the validity of the guarantee or that their challenge, if made, will

not be successful" (Compl. ¶ 48); (7) on January 22, 2004, PureChoice issued another

supplemental disclosure stating that according to Kenneth Macke's counsel

"[PureChoice] has no authority to represent that Mr. Macke has guaranteed the Notes

offered hereby, has no authority to provide financial information regarding Mr. Macke to

potential investors, and that Mr. Macke's financial information (previously provided at

Mr. Macke's request to the Company by Mr. Macke's accountant) was inaccurate.

Mr. Macke's counsel also indicated that Mr. Macke intends to contest the validity of his

signature" (Compl. ¶ 49); and (8) after knowledge of the challenges that were made to

Kenneth Macke's Guaranty, several investors who had previously committed to large

investments decided to back out, namely Baratz and his partners who intended to invest

six million dollars or more, Harris' investors who were interested in investing five million

dollars or more, Abens' investors who were willing to purchase at least three million

dollars in the Offering, and McConnell, who had located some interested investors.

(Compl. ¶ 50.)  The Court finds that Jeffrey Macke's arguments as to any intervening

causes or risk factors that would have caused PureChoice's economic loss go to proof

issues that are properly taken up at trial, but do not negate the fact that as pled, Jeffrey

Macke has sufficient notice as to the nature of PureChoice's fraud claim against him.

Thus, all of the required elements of this claim are adequately pled.

## IV.     Motion to Strike Paragraphs from the Complaint and for Sanctions

Jeffery Macke moves to strike paragraphs 54, 56, 61, and 77-91 from the

Complaint pursuant to Fed. R. Civ. P. 12(f).[10]  Rule 12(f) states, in pertinent part, that:

---

[10]     Jeffery Macke originally also moved to strike paragraph 63.  After oral argument was held on May 25, 2007, the Court asked the parties to submit an agreed-upon redacted amended complaint.  The parties did so, and this Complaint can be found at Docket No. 18.  Paragraphs 54, 56, 61, and 77-91 are redacted.  The parties did not redact paragraph 63.  By agreeing to allow paragraph 63 to remain public in the Amended Complaint the Court finds that Defendant Jeffrey Macke has withdrawn his motion to strike as to paragraph 63.

(Footnote Continued on Next Page)

"Upon motion made by a party . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  A district court enjoys "liberal discretion" under this rule.  *Stanbury Law Firm, P.A. v. Internal Revenue Serv.*, 221 F.3d 1059, 1063 (8th Cir. 2000).  However, striking a party's pleadings "is an extreme measure," and motions to strike under Rule 12(f) "are viewed with disfavor and infrequently granted."  *Id.*

Specifically, Jeffrey Macke asserts that PureChoice bases its allegations that Jeffrey Macke and his attorney's statements were false statements, specifically those regarding Kenneth Macke's financial status and mental capabilities, on documents that were produced in the M&I Litigation and that are subject to a confidentiality agreement and Protective Order. [11]  Jeffrey Macke also asserts that PureChoice's attorneys should be sanctioned for violating the Protective Order through its disclosures.  PureChoice

---

(Footnote Continued From Previous Page)

[11]     Parties to the M&I Litigation included Kenneth Macke, PureChoice, Reichel, and Perkins.  There, the parties entered into a Stipulated Protective Order, which the court entered on March 23, 2003.  The stipulation stated that:

> once designated as Protected Information, such Protected Information shall be used by the parties solely in connection with this litigation, and not for any other purpose, including any business, competitive, or governmental function, and such information shall not be disclosed to anyone except as provided herein.

(Hartman Aff., Ex. I at ¶ 3.)  The Court entered an Amended Protective Order with the same provision on June 29, 2006.  (Hartman Aff., Ex. J at ¶ 3.)

responds, asserting that: (1) Jeffrey Macke does not have standing to object to the use of the documents; (2) the documents and testimony were not marked or designated as confidential as was required through the protective order, and therefore confidentiality was waived; and (3) Jeffrey Macke made the Complaint public when he removed the case to this Court and filed the Complaint.

The Court finds that even if the documents should not have been utilized here pursuant to the prior protective order, the Court's decision as to whether PureChoice's fraud claim survives at this juncture does not rely on the specificity in paragraphs 54, 56, 61, and 77-91 in the Complaint.[12] Even without the support of those paragraphs, PureChoice has still alleged that Jeffrey Macke made a false representation when he stated that he had the authority to speak on behalf of his father and that his father would not be giving any more money to PureChoice.

Further, even setting aside the issue of standing, it was Jeffrey Macke that first made the Complaint public. PureChoice served the Complaint, but did not file the Complaint, thereby giving Jeffrey Macke the opportunity to file the Complaint under seal. Therefore, the Complaint was not public until Jeffrey Macke filed the Complaint when he removed the action to this Court. Jeffrey Macke could have protected the purported confidential information by filing the objected-to portions of the Complaint under seal. The Court finds that because PureChoice served but did not file the Complaint, and

---

[12] The Court also does not rely on paragraph 63.

because under the circumstances, it was reasonable for PureChoice to believe that the confidentiality as to at least some of the documents-at-issue was waived, even if PureChoice's actions were not completely consistent with the prior protective order, such actions were not flagrant or deliberate.  Further, Jeffrey Macke could have, at a minimum, contacted PureChoice and requested that it cure the alleged breach of the protective order before he filed the Complaint with this Court.  He did not do so.  Therefore, the Court denies Jeffrey Macke's Motion to Strike the paragraphs-at-issue from the Complaint.  In the interests of justice, however, the Court orders that paragraphs 54, 56, 61, and 77-91 continue to remain redacted and sealed from the public for the remainder of this case.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that**:**

1.    Defendant Jeffrey Macke's Motion to Dismiss (Doc. No. 2) is **GRANTED IN PART AND DENIED IN PART** as follows:

a.    Defendant Jeffrey Macke's Motion to Dismiss PureChoice's claim for tortious interference with contract (Count I) is **GRANTED**.

b.    Defendant Jeffrey Macke's Motion to Dismiss PureChoice's claim for fraud (Count III) is **DENIED**.

c.    Defendant Jeffrey Macke's Motion to Strike is **DENIED**. Paragraphs 54, 56, 61, and 77-91 of the Amended Complaint (Doc. No. 18) shall remain redacted.  The original Complaint (Doc. No. 1) shall remain under seal.

      d.     Defendant Jeffrey Macke's Motion for Sanctions is **DENIED**.

   2.     Count I of the Complaint (Doc. No. 18) is **DISMISSED WITH**

**PREJUDICE**.


Dated:  July 10, 2007        <u>s/Donovan W. Frank</u>
                              DONOVAN W. FRANK
                              Judge of United States District Court